603 F.2d 590
 7 O.S.H. Cas.(BNA) 1521, 1979 O.S.H.D. (CCH) P 23,696
CA 79-2617 CONTINENTAL CAN COMPANY, U. S. A., a Member of
the Continental Group, Inc., Plaintiff-Appellee,
v.
Ray MARSHALL, Secretary of Labor, et al., Defendants-Appellants.
 No. 78-2144.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 11, 1979.
Decided July 12, 1979.
 
 Dennis Kade, Asst. Counsel for App. Litigation, U. S. Dept. of Labor, Washington, D. C., for defendants-appellants.
 Charles M. Chadd, Chicago, Ill., for plaintiff-appellee.
 Before PELL and WOOD, Circuit Judges, and KIRKLAND, District Judge.*
 PELL, Circuit Judge.
 
 
 1
 The primary issue in this appeal is whether the district court erred in enjoining the Secretary of Labor (Secretary) from prosecuting all pending and future citations against Continental Can Company (Continental) pursuant to the Occupational Safety and Health Act (OSHA) regulations regarding excessive noise, 29 C.F.R. § 1910.95 (b)(1). Before addressing the application of collateral estoppel, exhaustion, and due process to the resolution of this issue, we will review the underlying facts as they are critical to our decision.
 
 
 2
 * Continental operates approximately eighty metal can manufacturing plants located throughout the country. In 1973, the Secretary issued citations alleging that Continental violated the noise standard set forth at 29 C.F.R. § 1910.95(b)(1)[1] in three of its plants in California. The cases were consolidated for hearing. Prior to the conclusion of the hearing, the Secretary issued five more citations to Continental for similar noise violations in plants in other states. After the hearing but before a decision was rendered, the parties stipulated that the record developed at the hearing would govern the disposition of the other five cases that the decision as to the feasibility of engineering controls in the three California plants would govern the five other cases.
 
 
 3
 Continental took the position at the hearing that the only valid interpretation of the noise regulation was that engineering controls could be required only if they were economically feasible in view of the available alternatives for protecting employee hearing. The Secretary contended that the issue of economic feasibility was not relevant and that technical feasibility was the only consideration.[2] Nevertheless, he introduced into evidence the Standard & Poor's financial report on Continental.
 
 
 4
 The administrative law judge (ALJ) issued his decision on October 1, 1974. He vacated the citations and held the noise standard invalid as interpreted by the Secretary insofar as it required the use of technically feasible administrative and engineering controls as opposed to personal protective equipment. The Secretary then petitioned for review by the Occupational Safety and Health Review Commission (Commission). 29 U.S.C. § 661(i); 29 C.F.R. § 2200.91. On August 24, 1976, the Commission affirmed in part the ALJ's decision. In this opinion, hereinafter referred to as Continental I, the Commission held that the noise regulation only required implementation of those engineering controls which were economically as well as technically feasible and that the Secretary failed to sustain its burden of proving the economic feasibility of engineering controls. The Secretary appealed to the Ninth Circuit, but then withdrew the appeal.
 
 
 5
 During these proceedings, the Secretary issued citations for similar noise violations at several other Continental plants.[3] After Continental obtained the favorable decision in Continental I it moved for summary judgment in the pending cases on the ground of collateral estoppel. On December 12, 1977, the Commission (in Continental II) held that Continental did not satisfy the requirements for the application of collateral estoppel and thus denied its motions for summary judgment and remanded the cases for hearings.
 
 
 6
 Continental then filed suit in the district court seeking to enjoin the Secretary from further prosecution of these noise cases. It alleged, in essence, that each of its eighty can manufacturing plants use the same machines to make the same product and thus produce the same excessive noise hazards. It had successfully litigated before the Commission the feasibility of engineering controls to reduce noise levels to acceptable standards in eight plants. Because the same issue was raised in the pending cases, it alleged that the Commission should have collaterally estopped the Secretary from relitigating the issue with regard to other plants throughout the country. The Commission's refusal to grant summary judgment on this basis, alleged Continental, would subject it to "needless, duplicative, and vexatious litigation" and accordingly would deprive it of due process of law. The district court agreed and entered an order enjoining further prosecution of the pending cases and issuance of any future citations charging excessive noise. It did not totally immunize Continental from all further noise regulation by the Secretary. The injunction was qualified, See note 7, Infra.
 
 II
 
 7
 The first and primary issue is whether the Commission in Continental II should have applied collateral estoppel to dismiss the pending cases. If collateral estoppel should have been applied, then we must determine whether Continental could properly raise the issue in a collateral action in district court or whether it should have exhausted its administrative remedies and raised it on review to the court of appeals. Finally, if the district court was an acceptable forum to seek relief from the Commission's refusal to apply collateral estoppel, we must determine whether that refusal constituted harassment and thus a violation of due process so as to justify the injunctive relief.
 
 
 8
 The doctrine of res judicata, of which collateral estoppel is a part,[4] is stated in § 1 of the Restatement of Judgments (1942):Where a reasonable opportunity has been afforded to the parties to litigate a claim before a court which has jurisdiction over the parties and the cause of action, and the court has finally decided the controversy, the interests of the State and of the parties require that the validity of the claim and any issue actually litigated in the action shall not be litigated again by them.
 
 
 9
 Accord Bowen v. United States, 570 F.2d 1311, 1320 (7th Cir. 1978). The underlying policy of the doctrine was articulated by Lord Justice Blackburn over a century ago:
 
 
 10
 The object of the rule of res judicata is always put upon two grounds the one public policy, that it is the interest of the State that there should be an end of litigation and the other, the hardship of the individual, that he should be vexed twice for the same cause.
 
 
 11
 Lockyer v. Ferryman, 2 App.Cas. 519, 530 (1877). Earlier this century the courts were unwilling to apply collateral estoppel to administrative determinations. Pearson v. Williams, 202 U.S. 281, 284-85, 26 S.Ct. 608, 50 L.Ed. 1029 (1906). The courts slowly eroded this position so that by 1966 the Supreme Court could state that "(w)hen an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose." United States v. Utah Construction & Mining Co., 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966). More recently, courts have expanded the application of collateral estoppel to serve the principle that one opportunity to litigate an issue fully and fairly is enough.[5]
 
 
 12
 In the present case, Continental argues that the only engineering controls that are technically feasible are machine enclosures and that it litigated the economic feasibility of these enclosures in Continental I. Because the Commission held that they were not feasible, the Secretary should be estopped from relitigating the issue for each of Continental's plants. To analyze the cogency of this argument, we must determine whether the issue decided in Continental I is the same as that raised in the subsequent cases, whether the issue was actually litigated, whether the decision in Continental I depended on the resolution of the issue,[6] and whether that decision was final. 1B Moore's Federal Practice P 0.441(2) (2d ed. 1974); Restatement of Judgments § 68 (1942).
 
 
 13
 We agree with the district court that the issue raised by the Secretary in the several cases the Commission remanded for a hearing in Continental II is the same as an issue decided in Continental I. In Continental I the Secretary had issued citations to Continental alleging that the plants in question did not use feasible engineering controls to reduce sound levels to acceptable levels as required by 29 C.F.R. § 1910.95(b)(1). The same allegations were made in the Continental II cases with respect to different plants. The identity of the issue depends on whether the different plants involved were plagued by similar excessive noise problems and whether the engineering controls available to reduce the noise levels were similar for purposes of determining their technological and economic feasibility.
 
 
 14
 The district court concluded that all of Continental's can manufacturing plants presented similar noise problems as a result of similar machinery. We agree. The parties stipulated that all plants have similar machinery and sound levels in excess of those permitted by the regulation. The stipulation states further that the 80 plants contain approximately 6,600 separate machines, 6,300 of which have been classified by Continental into nineteen families of basically similar machines for noise control purposes. The accuracy of this stipulation is buttressed by the fact that the Secretary in Continental I agreed without hesitation to consolidate the three California plants for hearing, and subsequent to the hearing agreed that the record developed at the hearing would govern the disposition of citations issued in five other plants in Mississippi and Ohio.
 
 
 15
 It was not until Continental II that the Secretary argued that the Continental plants were significantly different and that the differences affected the manner in which noise levels could be reduced. The Secretary's conduct suggests that he recognized the basic similarity of plants and noise reduction problems until he received an unfavorable ruling from the Commission, at which time he decided that a more successful tactic might be plant-by-plant litigation. The record does not support the Secretary's current position that the plants are dissimilar, but if he can show that the record is misleading in this regard, the qualifying language of the district court's injunction would permit him to issue citations against any plant shown to have significantly different noise problems or noise problems that could be reduced by feasible controls other than machine enclosures.[7] This also eliminates any problems of enforcement of the noise standard against Continental should circumstances change or should new technologies develop.
 
 
 16
 Having determined that the issue in the Continental II cases was the same as an issue in Continental I, the next step in this collateral estoppel analysis is whether the issue was actually litigated in Continental I. The Secretary argues that the issue of whether machine enclosures were Economically feasible was never really litigated in Continental I because he took the position in that litigation that economic feasibility was irrelevant. Continental, however, forcefully argued economic unfeasibility as a defense. Although the Secretary did not introduce much evidence on this issue, he did introduce the Standard & Poor's report on Continental's financial status. The requirement of collateral estoppel that the issue be "actually litigated" does not require that the issue be thoroughly litigated. Collateral estoppel may apply "no matter how slight was the evidence on which a determination was made, in the first suit, of the issue to be collaterally concluded." 1B Moore's Federal Practice P 0.441(2), at 3778 (2d ed. 1974). This requirement is generally satisfied if the parties to the original action disputed the issue and the trier of fact resolved it. James Talcott, Inc. v. Allahabad Bank, Ltd., 444 F.2d 451, 459-60 (5th Cir.), Cert. denied, 404 U.S. 940, 92 S.Ct. 280, 30 L.Ed.2d 253 (1971); See generally, Note, The Collateral Estoppel Effect of Administrative Agency Actions in Federal Civil Litigation, 46 Geo.Wash.L.Rev. 65, 68 (1977). Under this standard, the issue in the present case was actually litigated despite the imbalance in the quantity of evidence introduced.[8] Any other result would permit a litigant to avoid the conclusive effect of collateral estoppel, by design or by inadvertence, by denoting as irrelevant an issue clearly raised by his opponent and by refusing to introduce evidence on the issue. We do not condone such tactics whether used by a private litigant or by the Government.
 
 
 17
 The final requirements for the application of collateral estoppel are that the determination of the issue in Continental I be necessary to the decision there[9] and that the decision be a final one.[10] These requirements were clearly satisfied. The decision in Continental I specifically concluded that engineering controls were not economically feasible and on this basis vacated the citations. The decision was a final one because although the Secretary initially appealed to the Ninth Circuit, he withdrew his appeal. See Baltimore & O. R. Co. v. New York, N. H. & H. R. Co., 196 F.Supp. 724, 745 (S.D.N.Y.1961).
 
 III
 
 18
 Having established that the Commission should have applied collateral estoppel to dispose of the pending cases in Continental II, we must determine whether its refusal to do so justified the district court's injunction. Continental argues that requiring it to relitigate the same issue in potentially numerous additional hearings before the Commission would constitute harassment in violation of due process, and thus that the district court was justified in its action. The Secretary contends that the action was improper because Continental should have exhausted its administrative remedies.
 
 
 19
 We agree with the district court that requiring Continental to relitigate the issue "over and over in an untold number of hearings involving single plant (or small, consolidated group) citations is harassment of a capricious kind." Cf. United States v. American Honda Motor Company, 273 F.Supp. 810, 819-20 (N.D.Ill.1967). Requiring such wasteful relitigation also provides a sound justification for bypassing the generally applicable exhaustion of administrative remedies doctrine.[11]
 
 
 20
 The basic purpose of the exhaustion doctrine is to allow the administrative agency to perform functions within its special competence to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies. McKart v. United States, 395 U.S. 185, 193-94, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). The doctrine "is applied in a number of different situations and is, like most judicial doctrines, subject to numerous exceptions." Id. at 193, 89 S.Ct. at 1662. The present case provides a classic situation for deviating from the exhaustion rule. Exhaustion is not required if the established administrative procedures would prove unavailing or futile. League of United Latin American Citizens v. Hampton,163 U.S.App.D.C. 283, 285, 501 F.2d 843, 845 (1974). The essence of Continental's due process claim is that the Secretary's duplicative prosecutions are vexatious and harassing. Exhaustion of the administrative remedy causes the unconstitutional injury. If Continental is forced to defend the numerous prosecutions on the merits before the Commission prior to seeking a judicial determination that the prosecutions were unwarranted, the injury will have already been complete and uncorrectable. For these reasons exhaustion would not serve the purposes for which it was intended.[12]
 
 
 21
 The district court's decision to grant injunctive relief rather than requiring Continental to exhaust was premised on its finding that relitigating the issue on a plant-by-plant basis was harassment in violation of due process. This conclusion requires little discussion as it appears rather fundamental that the Government cannot, without violating due process, needlessly require a party to undergo the burdens of litigation. This basic tenet of due process was recognized in United States v. American Honda Motor Company, 273 F.Supp. 810 (N.D.Ill.1967), in which the court dismissed an antitrust indictment against Honda because an earlier similar indictment was settled by a plea of Nolo contendere. The Government argued that the later indictment was justified because it was prosecuting a series of separate local conspiracies and not a national one. The court disagreed and found a violation of due process. It characterized the Government's actions as "precisely the sort of harassment which fundamental fairness and the due process clause prohibit. The Government is not a ringmaster for whom individuals and corporations must jump through a hoop at their own expense each time it commands." Id. at 820.[13] This admonition applies equally to the present case. In sum, we agree with the district court that the Secretary's actions improperly exposed Continental to periclitations which under the circumstances here involved were sufficient for injunctive relief.
 
 
 22
 For the reasons stated herein, we affirm the judgment of the district court.
 
 
 
 *
 Judge Alfred Y. Kirkland of the Northern District of Illinois sat on this case at the time of oral argument by designation. On May 1, 1979, Judge Kirkland became a senior district judge of the Northern District of Illinois and is continuing to sit on this case by redesignation
 
 
 [1]
 The noise standard set forth in this regulation provides:
 When employees are subjected to sound exceeding those listed in Table G-16, feasible administrative or engineering controls shall be utilized. If such controls fail to reduce sound levels within the levels of Table G-16, personal protective equipment shall be provided and used to reduce sound levels within the levels of the table.
 Table G-16--Permissible Noise Exposure
 Duration per day, Sound level dBA
 hours slow response
 8 90
 6 92
 4 95
 3 97
 2 100
 1 1/2 102
 1 105
 1/2 110
 1/4 or less 115
 
 
 [2]
 Continental had conceded that the noise level in its plants exceeded the standard in the noise regulation. It also had conceded that technically feasible engineering controls existed that would reduce the noise level. This method of noise control requires partially or totally enclosing all the machines in a plant in noise-reducing housings. Continental has spent approximately $400,000 on developing enclosures for its machines. It estimates, however, that fabricating and installing enclosures around all its machines would cost approximately $32,000,000, and that the annual maintenance cost for the enclosures would be $175,000. Its current personal hearing protection program, involving earplugs and earmuffs, is capable of effectively protecting employees' hearing. The record shows that earplugs can reduce noise levels by 26 dBA and that earmuffs can reduce it by 35 dBA, far greater reductions than can be obtained by enclosures. Although ear protective devices have their drawbacks, e. g., employees dislike wearing them, the annual cost of this program is $100,000. The disparity in cost between ear protective devices and machine enclosures explains Continental's interest in the adoption of an interpretation of the noise regulation which considers economic feasibility
 
 
 [3]
 The district court found the following list of plants which had been cited, the date of each citation, and the status of each case:
 Plant Cited Date Disposition
 1. Los Angeles, Cal. 7/25/73 Dismissed by Review Commission.
 2. Pittsburg, Cal. 8/8/73 Dismissed by Review Commission.
 3. San Jose, Cal. 8/20/73 Dismissed by Review Commission.
 4. Pascagoula, Miss. 9/10/73 Dismissed by Review Commission.
 5. Worthington, Ohio 10/11/73 Dismissed by Review Commission.
 6. Bedford Hts., Ohio 2/25/74 Dismissed by Review Commission.
 7. Omaha, Nebr. 4/18/74 Pending.
 8. Cincinnati, Ohio 4/19/74 Dismissed by Review Commission.
 9. Columbus, Ohio 4/30/74 Dismissed by Review Commission.
10. Tampa, Florida 10/1/74 Pending.
11. St. Joseph, Mo. 12/16/74 Pending.
12. Peoria, Illinois 7/18/75 Dismissed on Secretary's
 (1420 W. Altorfer Dr.) motion September 25, 1975.
13. Albany, N.Y. 12/13/75 Pending.
14. Glendale, Wisc. 2/6/76 Dismissed by stipulation of
 the parties.
15. Miami, Florida 6/30/77 Pending.
16. Paterson, N.J. 11/18/77 Pending.
 
 
 [4]
 See Restatement (Second) Judgments xv (Tent. Draft No. 1, 1973). The Supreme Court distinguished between res judicata and collateral estoppel as early as 1876 in Cromwell v. County of Sac, 94 U.S. 351, 352-53, 24 L.Ed. 681 (1876):
 (T)here is a difference between the effect of a judgment as a bar or estoppel against the prosecution of a second action upon the same claim or demand, and its effect as an estoppel in another action between the same parties upon a different claim or cause of action. In the former case, the judgment, if rendered upon the merits, constitutes an absolute bar to a subsequent action. It is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose. . . . But where the second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered. . . .
 
 
 [5]
 For examples of this expansion in cases in which resolution of an issue in a prior Judicial forum was given conclusive effect in a subsequent proceeding, See Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). For examples of such cases in which resolution of an issue in a prior Administrative forum was given conclusive effect in a subsequent proceeding, See Bowen v. United States, 570 F.2d 1311, 1321-22 (7th Cir. 1978), and cases cited therein
 See also Safir v. Gibson, 432 F.2d 137 (2d Cir. 1970), Cert. denied, 400 U.S. 850, 91 S.Ct. 57, 27 L.Ed.2d 88, in which the court enjoined the Maritime Subsidy Board from relitigating an issue that had been litigated by the Federal Maritime Commission. The court there noted that "the reason for applying res judicata to administrative agencies is not only to 'enforce repose' but also to protect a successful party from being vexed with needlessly duplicitous proceedings." Id. at 143.
 
 
 [6]
 Collateral estoppel does not apply to issues that might have been litigated and determined in the earlier action but were not; nor does it apply to any matter not essential to the judgment in the prior adjudication. See Cromwell v. County of Sac, 94 U.S. 351, 24 L.Ed. 681 (1876); Stebbins v. Keystone Insurance Co., 156 U.S.App.D.C. 326, 331, 481 F.2d 501, 506 (1973)
 
 
 [7]
 The qualifying language of the injunction states:
 Defendants must leave plaintiff alone on this issue, unless or until the Secretary (OSHA) can specify and prove the feasibility of some engineering or administrative controls, other than machine enclosures, which will do as effective a job of employee protection as the present personal protection devices at comparable cost on a national basis (i. e., in all, or substantially all, of plaintiff's 80 plants involved), or in some one or several plants shown to be unique.
 We interpret the phrase Shown to be unique in the last two lines to mean shown to have significantly different noise problems or noise problems that could be reduced in a significantly different manner than those occurring in the plants at issue in Continental I.
 The Secretary argues that Continental's plants are not similar for noise reduction purposes and that this is a factual issue which the Commission, and not the district court, is entitled to determine. The Commission's finding in Continental II, however, that the plants are not similar is not supported by substantial evidence in the record considered as a whole. Moreover, the qualifying language in the district court's injunction permits the Secretary to act against noise violations if it can at any time show the dissimilarity it alleges.
 
 
 [8]
 We note, as did the Fifth Circuit, that
 whenever a court considers applying the doctrine of collateral estoppel, there is always a lingering question whether the party might have succeeded in proving his point if he had only been given a second chance at producing evidence. Without more, however, this question is not sufficient to outweigh the extremely important policy underlying the doctrine of collateral estoppel that litigation of issues at some point must come to an end.
 James Talcott, Inc. v. Allahabad Bank, Ltd., 444 F.2d at 463.
 
 
 [9]
 See generally, 1B Moore's Federal Practice P 0.443(5) at 3919 (2d ed. 1974)
 
 
 [10]
 See id. at P 0.409; Coca-Cola Co. v. F. T. C., 475 F.2d 299, 304 (5th Cir.), Cert. denied, 414 U.S. 877, 94 S.Ct. 121, 38 L.Ed.2d 122 (1973). Cf. United States v. Willard Tablet Co., 141 F.2d 141 (7th Cir. 1944)
 
 
 [11]
 The doctrine essentially is that "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938)
 
 
 [12]
 The Secretary relies for its exhaustion argument on cases which require exhaustion notwithstanding the fact that constitutional questions are raised. See, e. g., Blocksom & Co. v. Marshall, 582 F.2d 1122 (7th Cir. 1978); Marshall v. Northwest Orient Airlines, Inc., 574 F.2d 119 (2d Cir. 1978). The present case is distinguishable, however, because here the constitutional injury can be avoided by eliminating the exhaustion requirement, whereas in Blocksom and Northwest Orient the constitutional injury would persist regardless of whether the exhaustion requirement were eliminated
 
 
 [13]
 The Secretary discounts the persuasiveness of Honda on the premise that the district court in Honda was the proper fact-finder, whereas in the present case the district court usurped the fact-finding responsibilities of the Commission. We disagree with the Secretary's premise, See note 8, Supra, and thus find Honda persuasive